1          **UNITED STATES DISTRICT COURT**

2       **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

4

5    **UNITED STATES OF AMERICA,**          )
                                           )
6                    **PLAINTIFF,**         ) CASE NO.
                                           ) CR 15-0060
7          **VS.**                          )
                                           )
8    **MUHANAD ELFATIH M. A. BADAWI,**      )
                                           )
9                    **DEFENDANT.**         )
     _____)

10

11

12

13

14        **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15          **TUESDAY, DECEMBER 22, 2015**

16                **11:06 A.M.**

17          **LOS ANGELES, CALIFORNIA**

18

19

20

21

22
        _____
23

        **MAREA WOOLRICH, CSR 12698, CCRR**
24      FEDERAL OFFICIAL COURT REPORTER
        255 EAST TEMPLE STREET, ROOM 181-K
25      LOS ANGELES, CALIFORNIA 90012
        mareawoolrich@aol.com

**UNITED STATES DISTRICT COURT**

```
 1                    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4        EILEEN M. DECKER
          UNITED STATES ATTORNEY
 5        BY:  JUDITH HEINZ
          ASSISTANT UNITED STATES ATTORNEY
 6        UNITED STATES COURTHOUSE
          312 NORTH SPRING STREET
 7        LOS ANGELES, CALIFORNIA 90012

 8        AUSA - OFFICE OF US ATTORNEY
          TERRORISM AND EXPORT CRIMES SECTION
 9        BY:  CELESTE CORLETT
          411 WEST FOURTH STREET, SUITE 8000
10        SANTA ANA, CA 92701

11

      FOR THE DEFENDANT:
12
          CORRIGAN WELBOURN & STOKKE APLC
13        BY:  KATHERINE T. CORRIGAN
          4100 NEWPORT PLACE, SUITE 550
14        NEWPORT BEACH, CA 92660

15

      ALSO PRESENT TELEPHONICALLY:
16
          DAVID SHINN
17        DR. LISA HOPE
          COMMANDER MICHAEL FORBES
18        DR. JAMES PELTON

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, DECEMBER 22, 2015

 2                              11:06 A.M.

 3                               -oOo-

 4

 5              THE COURT:  We are on the record now in the matter

 6    of United States versus Mr. Badawi.  It's 15-0060.

 7              And, Counsel, if you'd be kind enough to make your

 8    appearance, please.

 9              MS. HEINZ:  Good morning, Your Honor.  Judith Heinz

10    on behalf of the United States.

11              MS. CORLETT:  Celeste Corlett also on behalf of the

12    United States.

13              THE COURT:  Good morning.

14              MS. CORRIGAN:  Good morning, Your Honor.  Kate

15    Corrigan on behalf of Mr. Badawi.  He's present in custody.

16              THE COURT:  All right.  Mr. Badawi is present, as

17    you stated.

18              And I'm looking for any information.  I talked to

19    the warden, I think on the last occasion on Saturday,

20    encouraged him to spend a nice Sunday and then we'd talk again

21    in court.

22              So, warden, if you'd be so kind or members of your

23    professional staff, the chief psychologist, chief medical

24    officer.  Dr. Pelton, are you there?

25              DR. PELTON:  Yes, Your Honor.
```

1          THE COURT:  And the family is here, which is

2     excellent.  Thank you.  I think the mother just arrived.

3          MS. CORRIGAN:  She did, Your Honor.  Thank you.

4          And one other thing, Your Honor.  At some point, we

5     all had had a conversation, not with the Court, but there's

6     some issues that I would like to put on the record just to

7     supplement the record from Friday, and we've all agreed that I

8     will be the one that supplements the record.

9          THE COURT:  Do you want the medical staff to go

10    first with the report to me?  Do you want to go first?

11         MS. CORRIGAN:  Which -- I can go first.  It might

12    make it more chronological that way.

13         THE COURT:  Okay.

14         MS. CORRIGAN:  First of all, as -- I did have an

15    opportunity to meet with my client this morning.  And just for

16    the record, I did advise Dr. Hope and the other folks that are

17    here today that in my presence my client consumed a Super Boost

18    chocolate container, the contents of the container.

19         And as for Friday, one of the things that I think

20    that was missing from the record -- we talked about the Boosts,

21    but I wanted to make it clear that those are supplements to the

22    meals that my client had been provided by the MDC staff.  And

23    that was also in addition to the IV fluids that were mentioned

24    on the record by Dr. Hope on Friday.

25         The other thing is today I was also advised that my

1   client's family has been approved -- and I'd just note for the

2   record now additional members of the family have arrived.  We

3   are now up to five members of the family.  The family members

4   have been approved on an expedited basis to visit with my

5   client at MDC.

6          After our meeting in the courtroom on Friday, I want

7   to let the Court also know that Dr. Hope and the warden, along

8   with the marshal's office, made available the third floor

9   lockup area for me to meet with my client and his family.  I

10  observed the family visit with my client and stayed with them

11  the entirety of the time.  As the Court may or may not know,

12  that day was also my client's birthday.  So that was a welcome

13  event for the family to be able to spend some time with him.

14         What I did notice is that I did observe my client

15  speaking with his family.  They weren't, for the most part,

16  speaking English, but I did observe him speaking.  My client

17  seemed to perk up quite a bit.  I saw him smile.  And he seemed

18  to be at times even somewhat animated and happy, which I have

19  not observed in some time.

20         The family sang to him in celebration of his

21  birthday.  And they -- they continued to encourage my client to

22  participate with counseling with Dr. Hope and also to continue

23  to take in food and liquids.

24         Mohammed, his brother, who is present in the

25  courtroom -- Mohammed Badawi acts as an interpreter for me

1  during those times and may -- his sister at times also but

2  primarily Mohammed does.

3         During that visit I observed him consume a sandwich,

4  a Boost, and I think barbecue flavored chips, but they were

5  chips, a bag of chips, at least part of them.

6         I did also notice some eye contact, which my client

7  prior to these events has always been good at least with me and

8  my staff with maintaining good eye contact.  I think the Court

9  has noted a number of times during the course of these hearings

10 that my client has not been maintaining any eye contact with

11 anyone.  But I did observe him have eye contact with his family

12 on Friday.  And I could also report to the Court that I had eye

13 contact with him this morning.

14         So I'm hoping that those are good signs.  I think

15 it's important information, particularly for Dr. Hope, to know

16 about.  And I have discussed these issues with her and the

17 warden so they were up to speed in terms of what my

18 observations were in an effort to assist them in assisting my

19 client.

20         THE COURT:  Ms. Corrigan, thank you very much.

21 Appreciate it.

22         Warden?  Dr. Hope?

23         MR. SHINN:  We have good news to report, Your Honor.

24 Mr. Badawi has continued to increase his intake of whole foods

25 beyond the Boost supplements which he's receiving twice a day.

1    His weight this morning prior to IV or anything was at

2    117 pounds, which is approximately what he arrived at several

3    weeks ago when he arrived at MDC.

4                THE COURT:  Okay.  Excellent.  Thank you.

5                Dr. Hope, any thoughts?

6                DR. HOPE:  Well, good morning, Your Honor.

7                THE COURT:  Good morning.  And let me say that I'm

8    not inquiring about specifics mentioned in conversation,

9    et cetera.  I can always get a report.  But I don't want

10   anything to interfere with the trust you were able to develop

11   and the confidence by making a specific inquiry.

12               DR. HOPE:  Actually, with him, we are seeing an

13   increase in the voluntary taking of whole foods.  He is

14   becoming more verbal with some staff, still not as verbal as we

15   would like to see him in general.  Definitely an improvement in

16   presentation.  We would also like to see him voluntarily take

17   in more fluids and not require the IV any longer.

18               THE COURT:  Okay.  Is he still on an IV?

19               DR. HOPE:  At this time, yes.

20               THE COURT:  Fluids -- okay.  Are you able to engage

21   him in some kind of conversation?

22               DR. HOPE:  It's still very limited.

23               THE COURT:  Is that because of any language barrier?

24   I don't know a lot about the client.

25               DR. HOPE:  No, Your Honor.

1          THE COURT:  Okay.  So very limited conversation.

2          Okay.  Commander, any thoughts?

3          MR. FORBES:  He seems to be more stable.  He's not

4    shaking or trembling anymore.  He seems to assist himself in

5    getting out of the bed and up and down.  He seems a lot more

6    alert.  He's still not very communicative.  But, you know,

7    he'll answer "yes" and "no" sometimes.

8          THE COURT:  Okay.

9          MR. FORBES:  Yesterday -- yesterday he not only ate

10   the food on his tray, but it was actually quite voraciously.

11         THE COURT:  All right.

12         MR. FORBES:  So that was very nice to see.  The one

13   thing that we are having a problem with is that he -- we

14   offered him the urinal probably ten times during the

15   IV infusion over that two-hour period.  And he went ahead and

16   just urinated on himself instead.

17         THE COURT:  Okay.

18         MR. FORBES:  All labs show that that shouldn't be a

19   problem.

20         THE COURT:  Okay.  Thank you.  Appreciate it.

21         Dr. Pelton, any thoughts?  Doctor, are you there out

22   in Colorado?

23         DR. PELTON:  Yes, Your Honor.

24         THE COURT:  Any thoughts after hearing this

25   conversation?

**UNITED STATES DISTRICT COURT**

1          DR. PELTON:  Well, yes, Your Honor.  I'm cautiously

2    optimistic that things are moving in the right direction.  My

3    hope is that we can transition away from the IV hydration to a

4    situation where he can take most of his hydration through

5    drinking fluids.

6          THE COURT:  Okay.

7          DR. PELTON:  So that is -- that's kind of the focus

8    I have right now.  You know, the overarching goal is to protect

9    his health in the least invasive way possible.  And right now

10   the most invasive thing that we are doing are these daily IVs.

11   So that's where I'm putting the focus.

12         THE COURT:  Okay.  I was told either in court or in

13   a conversation with the warden, and I forget which, that there

14   had only been one involuntary feeding thus far.  Is that

15   correct information?  And I apologize for not remembering if it

16   was in Friday's session or during the conversation we had on

17   Saturday.

18         MR. SHINN:  Yes, Your Honor.  There was one, the

19   initial.

20         THE COURT:  Okay.  Let me give you some thoughts,

21   not a ruling.  I'm not a medical doctor.  So I'm very dependent

22   upon what you eventually think.

23         First of all, I don't know his ability to

24   communicate versus his willingness to communicate with you as

25   the chief medical officer or the psychologist.  It's really

1    Ms. Corrigan's representations eventually about her ability to

2    communicate with her client, understand the proceedings, aid in

3    the defense that become of great consequence to the Court.

4              Second, I don't know the right measurements or marks

5    or milestones, and I don't know if it's weight, BMI, you know,

6    a combination of factors.  And at some time, at some point I'm

7    cautiously optimistic also that we've reversed this process.

8              I would like to get him back to Santa Ana, but I'm

9    not willing to make that ruling even when you come forward as a

10   medical staff without the second area of concern giving me some

11   confidence.

12             And that area of concern is this:  At some point, if

13   these efforts on all of your parts, which I commend, are

14   successful, you may be able to come to me in some period of

15   time and say, Judge, medically speaking, there's nothing else

16   that we would undertake.  He's shown us a voluntariness in

17   terms of fluid intake, voluntariness in terms of food.  It's

18   been over this period of time.  So we have a confidence in

19   that.

20             We also have a confidence in his BMI or his weight

21   or whatever.  I'm not going to turn to Ms. Corrigan, of course,

22   because there's the ability to communicate that I don't expect

23   that you can measure.

24             But the second thing is I'm really concerned that I

25   would make a premature ruling because I have such a desire to

 1   get him closer to Ms. Corrigan, closer to the family, and that

 2   becomes the Bellwether mark.

 3          Because one of the things I'm convinced of is

 4   there's a good possibility he was willing to undertake some of

 5   the initial voluntary feeding because, frankly, the involuntary

 6   feeding is not as comfortable, it's degrading.  And I don't

 7   know -- I can't measure what that mindset was.

 8          The worst thing I can do is send him back to

 9   Santa Ana and have him decide in a half day or a day not to

10   eat.  Then I've got to bring him back up the highway.  And if I

11   bring him back up the highway the second time, then I've got

12   the problem of being very reluctant to return him and go

13   through that process again.

14          Now, I don't believe that there's any great danger

15   in doing that at some point for this reason:  When I got the

16   call before, it was basically, quote/unquote, he was starving

17   himself to death.  That wasn't from you.  That was from the

18   marshal's office.

19          It's a false alarm in the sense that this had to be

20   taking place over a long period of time.  Somehow Santa Ana

21   didn't communicate with the marshals or the marshals didn't

22   communicate with Santa Ana.  I'm not fault finding.  But that

23   wouldn't happen again because he's on everybody's radar.  And

24   if he didn't take a meal within one half a day, I would know

25   about that, and he'd be right back down the highway with maybe

1    a pound or two of loss but not 20 or 30 pounds of loss.  So I

2    don't think we have that fear factor.

3            The problem is that this thought that was conveyed

4    that he's going to voluntarily fast on two days -- I want to be

5    gentle with this -- is nonsense.  And I made the statement

6    before about this not being Ramadan and this not being Friday,

7    and you can eat any time except Ramadan, you can't.  You have

8    to eat after darkness, if you will.  So this is volitional on

9    his part.

10            And, Ms. Corrigan, unless I hear -- engage in some

11   kind of conversation with you and your client that this -- that

12   he's giving up, in a sense, that I really have a person who

13   wants to go back to Santa Ana and is going to eat -- what I

14   can't do is I can't take that opportunity or chance even if the

15   doctors prescribe that he's medically healthy and then have us

16   going down the highway with Monday comes along and I'm not

17   eating.  That will get him right back on the highway.

18            Now, the second thing I'm going to toss out to both

19   of you -- and this is for you and the government to discuss --

20   I can't help that there was a little bit of notoriety already

21   about Mr. Badawi unrelated to the other client.  The other

22   client is not here for the moment.

23            I'm not making a ruling, but I'm making a

24   representation to you that, if you two decided that the case is

25   better tried in Los Angeles, I can move the case to

```
 1   Los Angeles.  If the case is better tried in Orange County with
 2   more access to the family, I can keep it in Orange County.
 3            I drove up here for two years of my life for the
 4   Mexican Mafia trial.  I can certainly come back for a couple
 5   weeks if that's better for everybody.  I don't want to move the
 6   case down.  It's a Southern Division case.  It should remain in
 7   the Southern Division.  The family should have access, if you
 8   will.
 9            I don't think there's going to be any unfairness.  I
10   don't think six months from now anybody could possibly remember
11   this incident.  And we'll have a good jury venire and product
12   of questioning just to make sure that we don't have any
13   collateral damage.  So I'm not worried about an article now.
14            But I'm deeply worried about an article if this
15   occurred again in the press one week before trial.  So you hear
16   my concern about making a mistake as a judge and doing what I
17   think is the right thing and getting him back in front of a
18   jury and then we go through this process again of potentially
19   involuntarily feeding again and the press picks that up again
20   and it's 30 days before trial and he recovers and he's lucid
21   enough to have a joint trial -- we are either going to hold it
22   or we're not going to hold it in Seattle or Portland if I can
23   get a fair jury in Los Angeles.  But we are right back down the
24   highway, which has the prosecution jumping for joy.  I'm just
25   kidding you, because your own office is here.
```

1          So I'm not saying we're going to do that.  I want

2    this in the Southern Division.  It's where the case belongs.

3    But, you know, if we run into medical problems and I have to

4    bring him back up the highway, he's probably going to

5    permanently stay.  If we've made a mistake or I made a

6    mistake -- let me take the responsibility -- he's going to stay

7    right here in Los Angeles.

8          I'm going to come to LA, because then I have the

9    ability to undergo involuntary feeding during the trial.  I can

10   maintain the sustenance.  So just Ms. Corrigan and I are going

11   to be inconvenienced in that sense.  But I'm certainly not

12   going to inconvenience you, and I'm not going to inconvenience

13   Mr. Badawi by having involuntary feeding and running him down

14   the highway, running him sometime back up in the afternoon to

15   get involuntary feeding and trying to run down the highway with

16   the jury.

17         So I'm trying to think ahead, you know, what's fair,

18   what works.  I'm going to suggest this.  And if there's a

19   disagreement, Ms. Corrigan, push back.  Government, push back.

20   All of you, push back on me.

21         I don't see any reason right now for me to come up

22   tomorrow, nor between, quite frankly, Christmas and New Year's.

23   Now, I'm here, and we can all have a big party and get

24   together.  I'm just kidding you.  But I don't see any reason.

25   We need a period of time.  And I'm thinking -- I'm running out

1   of resources.  But I'll try again January 5th, coming back up

2   the highway again, okay?  Or on the 6th or on the 7th.

3           MS. CORRIGAN:  The 10th?

4           THE COURT:  Or the what?

5           MS. CORRIGAN:  The 10th.  Your Honor, if I might,

6   Your Honor, that first week of January I'm committed to

7   teaching at a Trial Skills Academy.

8           THE COURT:  You keep that.  But I'm not here that

9   second week.

10          MS. CORRIGAN:  If the Court -- what I was going to

11  suggest, if the Court would be willing, I could have

12  Ed Welbourn be physically in the courtroom, but I could appear

13  telephonically with the Court's permission.

14          THE COURT:  Would that be acceptable?  Would that be

15  acceptable to you?

16          MS. HEINZ:  The government has no objections to

17  that.

18          THE COURT:  Okay.  That would be good, because it

19  would get -- I'm not ready to see him next week.  It's just too

20  soon.  I need a period of time.

21          And, number two, I'm not representing that I would

22  even make the order or feel confident on January 5th.  So

23  January 5 is a check-in date.  It's not an order date by me.

24  And I'm not thinking of Santa Ana on that day.

25          Then I would like to take another couple weeks.  So

there's no expectation on anybody's part that this is happening

tomorrow, I'd like for you to get with your client.  I'd like

to see where you stand.  And even if it's in camera, you know,

I'd like to know, you know, can we get rid of this idea that we

are voluntarily fasting on these days.  Because if he starts

that fast again, he's coming right back up the highway.  I

can't let him get to where he is now.

Number two, at 117 pounds, I'm far from being

satisfied.  I commend everybody.  But that's why we took him

in.  We took him in because he was, according to the marshals,

starving to death at 117.  So I've got to see weight, BMI,

however you measure that.  And I've got to see the

communication ability that Ms. Corrigan's representing to me

that he has.

And I think I want to have a conversation, with your

permission, Ms. Corrigan, and get something on the record from

your client, even in camera, so there's no statement that the

government could use in case he said something inappropriate.

Then I have the confidence level.  Okay?

So I'm looking really at a test run of about ten or

so days.  I'll come back up the highway.  Maybe two weeks after

that, let's see how he's doing.  And if we are on a good course

and I get the representations, then let's talk about

potentially cutting that order but not until you give me the

first prong.  Is he medically able to sustain himself?  Is he

taking in fluid without an IV?  Then let me have a conversation with Ms. Corrigan about his lucidity and whether he's willing to give up this voluntary fasting.

Okay.  Now, push back.  Tell me why that's inappropriate, what I could be doing better at this point to help all of you.

So, Ms. Corrigan, I think you are my mainstay right now.  We'll turn to you.  Do you have any better suggestion?  If so, I may adopt it.

MS. CORRIGAN:  No, Your Honor.  In fact, it pretty much mirrors my conversation with my client this morning that I anticipated a timeline similar to what the Court is indicating.  I think it's appropriate because one of the things that I also need to feel comfortable with is that he's stabilized, not only in his weight but also from the perspective of what I'm going to call Dr. Hope's area of expertise to make sure that he's emotionally and psychologically stable.

Although I observed him communicating better with his family, I do feel that I need additional certainty that my client is in a position to effectively assist me in his defense because, as the Court knows and I've noted before and I continue to note in my conversations, even with him this morning, when I met with him this morning down in lockup, he is communicating but not in any -- not anywhere close to the level that he was able to communicate with me prior to this whole

1   process starting up.  He used to be very conversational with

2   me, very productive in our meetings.  I don't feel that

3   confidence at this point.

4          And -- but I do see -- but with that kind of

5   negative statement, what I do see is an upswing.  I'm very --

6   I'm cautiously optimistic.  And I do think that time will give

7   us the time that he needs to regain his strength on a number of

8   levels.

9          One of the things I can indicate to the Court is my

10   client does very much want to get back to Santa Ana.  He

11   understands the -- my feeling is he understands the Court's

12   concerns and that, if this were to start up again, which I hope

13   it does not -- but, if it were to start up again, that we'd be

14   back here and be staying in Los Angeles.  I understand what the

15   Court's concerns are.

16          THE COURT:  But, you know, we'd catch it in that

17   case.  In other words, I wouldn't get this frantic Friday phone

18   call at 5:00 o'clock or whatever saying he's starving himself

19   to death.  We'd know if he skipped a couple meals.  We'd

20   probably lose half a day literally.  So he's not going to be in

21   any grave danger.  So I'm not concerned about taking the

22   chance.

23          I'm just concerned if I take the chance, if I make a

24   misjudgment on that without, you know, the blessings of the

25   medical staff, Santa Ana, you, then he's right back up the

1    highway.  Then I'm very reluctant to go through that process

2    again.

3             MS. CORRIGAN:  Correct.  And also I'd note too, I've

4    noticed a big upswing in his demeanor, and Dr. Hope has noticed

5    it as well, when he's in the presence of his family.  Dr. Hope

6    advised me this morning, as did the warden, that the paperwork

7    has been expedited, as I indicated earlier.  His family members

8    have all been approved.  I let my client know this moments ago

9    after Dr. Hope advised me of that.

10            I think with the combination of these factors,

11   hopefully, you know, in the coming weeks he will be back to his

12   old self, so to speak.  And with the combination with these

13   folks working as a team and his family to come visit him,

14   hopefully he'll get back to a point where he can assist me.

15   And this Court knows I'm more than happy to drive up to the

16   MDC.

17            THE COURT:  I know you are.

18            I don't want to exclude the government if you have

19   any thoughts.  I don't think that this is an area particularly

20   that you can give guidance, but I don't want to be

21   discourteous.

22            MS. HEINZ:  I understand, Your Honor.  The

23   government is encouraged, as is everyone else, by the apparent

24   improvement.  And I think the Court is saying that the Court

25   needs to see more improvement, and the government would agree

1    with that, that we need to see more improvement before the

2    Court decides whether he is moved to Santa Ana or not.

3         The only -- the only thing the government has to

4    offer, I guess, or to add in terms of information is it's my

5    understanding that, if he is returned to Santa Ana, that

6    Dr. Hope will not be having the contact with him in Santa Ana

7    so that she will transition out.  And so I just put that on the

8    record as information for -- additional for the Court.

9         THE COURT:  Yeah, if any of you as the medical

10   staff, Warden, Dr. Hope, Commander, if any of you individually

11   or collectively tell me that this isn't a good idea, I'm going

12   to adopt that right away.  He's going to stay.

13        It's going to have to be because you really believe

14   he's self-sustaining and -- you can't be a prognosticator and

15   tell me if he's going to voluntarily eat his food once he gets

16   down the road, but I have to know that you are very comfortable

17   in terms of his self-sufficiency.  And until that happens,

18   there's no movement.

19        So, Mr. Badawi, you really hold the keys in your own

20   hand, in a sense, on how quick I can get you back to Santa Ana.

21   That's my goal.  I want to do that on behalf of your mother,

22   your family, you, your counsel, just the process.  You've heard

23   the conversations at least today, and I'll repeat that again in

24   January when we return just to make certain it's redundant.

25        Now, let me ask you, what's the best day for you?

```
 1   In other words, I'm willing to come up that highway.  At some
 2   point I can't, or I've got to meet you at 7:30 in the morning,
 3   which is normally when I start my court.  And I can get here at
 4   7:00 or 7:30.  I just don't know if all of you want to be here
 5   at 7:00 or 7:30.
 6            So, Ms. Corrigan, government, I don't care if it's
 7   Tuesday or Wednesday.  But I want to have it -- I don't want it
 8   on a Monday.  It's a transportation day.  It's hard for the
 9   marshals.  The marshals -- O'Connor told me that.  So I want to
10   keep it off of a Monday.
11            MS. HEINZ:  Your Honor, the government would be
12   available pretty much any day that week.
13            THE COURT:  Okay.  Ms. Corrigan, what's the best for
14   you?
15            MS. CORRIGAN:  I think that January 5th would be a
16   good day for my office, Your Honor.
17            THE COURT:  Tuesday?
18            MS. CORRIGAN:  Yes, Your Honor.
19            THE COURT:  Okay.  Warden, if that's not a good day,
20   we'll put it on Wednesday.
21            MR. SHINN:  That works for us.
22            THE COURT:  Dr. Hope, how about you?  Is that okay?
23            DR. HOPE:  That's fine, Your Honor.
24            THE COURT:  Commander?
25            MR. FORBES:  Yes.
```

```
 1              THE COURT:  Now, what's the best time?  11:00?
 2   Because, you know, I start at 7:30 in the morning in my court.
 3   And I can meet you at 5:00 or whatever time.  I don't have to
 4   interfere with hours so -- I don't have hours in my court.
 5              MS. HEINZ:  Your Honor, the government will defer to
 6   Ms. Corrigan as to her schedule.  However, I know that my
 7   co-counsel, Ms. Corlett, does have to make the drive.  So
 8   oftentimes --
 9              THE COURT:  You are down in Santa Ana?
10              MS. HEINZ:  She is down in Santa Ana.
11              MS. CORLETT:  Yes, Your Honor.
12              THE COURT:  What a wonderful opportunity and place
13   for you to be.  I'm just joking.
14              11:00?
15              MS. HEINZ:  Anyway, not before 10:00, I think, is
16   helpful.
17              THE COURT:  Not before 10:00?  Yeah, we are fighting
18   the same traffic.  So if you are not here, we know where you
19   are.  You are with us in traffic.
20              So, Ms. Corrigan, is 11:00 o'clock okay?
21              MS. CORRIGAN:  11:00 o'clock is super, Your Honor.
22   What I'll do is I'll confer with the clerk to find out whether
23   the Court will be calling me or whether I should call in.  And
24   then I will have Ed Welbourn from my office, who is a panel
25   member, here in the courtroom.
```

1          THE COURT:  If you are engaged in a seminar, you

2     stay with that seminar.  You don't have to call in.  I think

3     Mr. Welbourn is extraordinarily competent also.  He can give

4     you back that information.

5          You know, I'm not ordering him down the highway on

6     January 5th.  It's a check-in day.  And -- but the next

7     occasion may be a very important occasion depending upon if we

8     see this continued growth.  Then I'll need to check and make

9     sure that you are available and you've had time to talk to your

10    client and get your thoughts.  Okay.

11         MS. CORRIGAN:  Understood.  And I believe it's just

12    that one week that I'm gone.

13         THE COURT:  It's not a problem.

14         All right.  Then I want to thank all of you.  I want

15    you to have a really great holiday for everybody.  And I really

16    appreciate your competency and your willingness to discuss this

17    with the Court.

18         Okay.  We are in recess.

19         MS. CORRIGAN:  Thank you, Your Honor.

20         (At 11:34 A.M. the proceedings adjourned.)

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

6   REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

7   CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

8   TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

9   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10  REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11  THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15                    DATED THIS  28TH  DAY OF JANUARY, 2017.

16

17

18                    /S/ MAREA WOOLRICH

19                    MAREA WOOLRICH, CSR NO. 12698, CCRR
                      FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**